**KOPPERS COMPANY, INC., Plaintiff,**

v.

Civ. A. No. 88–557.

United States District Court, W.D. Pennsylvania.

May 11, 1988.

Joseph A. Katarincic, David Borkovic, Kirkpatrick & Lockhart, Edward B. Wood, Koppers Co., Law Dept., Pittsburgh, Pa., for plaintiff Koppers Co., Inc.

William M. Wycoff, Ralph Scalera, Craig Frischmann, Thorp, Reed & Armstrong, Pittsburgh, Pa., Edwin B. Mishkin, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants BNS Partners, BNS Inc., Bright Aggregates, Inc., and Beazer PLC.

James D. Morton, Stanley Yorsz, Buchanan Ingersoll, P.C., Pittsburgh, Pa., Stephen Greiner, Willkie, Farr & Gallagher, New York City, for defendants American Exp. Co., Shearson Lehman Brothers Holdings, Inc., Shearson Lehman Hutton, Inc., and SL–Merger, Inc.

Theodore O. Struk, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for defendant Nat. Westminster Bank PLC.

ORDER

COHILL, Chief Judge.

AND NOW, to-wit, this 11th day of May, 1988, the Court having made certain inquiries of the Board of Governors of the Federal Reserve System, and the Court having received a response thereto in the form of the letter attached hereto as Appendix A, It Is Hereby ORDERED, AD-

JUDGED, and DECREED that the parties hereto be, and hereby they are, directed to file briefs addressing the legal points raised in said Appendix A and outlining what areas, if any, will require an evidentiary hearing. A status conference will be held in this Court at 9:30 A.M., May 20, 1988 to review the points raised and to schedule the evidentiary hearing if needed.

## APPENDIX A

CONFIDENTIAL

Honorable Maurice B. Cohill

Chief Judge

United States District Court for the Western District of Pennsylvania

United States Courthouse

7th & Grant Streets

Pittsburgh, Pennsylvania 15219

Dear Judge Cohill:

This is in response to your request for guidance from the Board of Governors or its staff concerning the application of the Board's Regulation G, governing securities credit by persons other than banks, brokers or dealers (12 C.F.R. Part 207), to a specific set of facts at issue in a case pending in your Court. The action was brought by Koppers Company, Inc. ("Koppers") to enjoin BNS, Inc. ("BNS") from completing a tender offer for stock of Koppers on the ground that the offer violated various aspects of the Williams Act.

On April 15, 1988, the Court issued a preliminary injunction against completion of the tender offer, holding, among other things, that there is a high probability that Koppers would be able to establish at trial on the merits that the bidders had failed adequately to disclose potential violations of the margin regulations. On April 20, the defendants in the action filed a Motion for Determination that Proposed Corrective Disclosure Will Satisfy and Discharge April 15, 1988 Order. Noting that the resolution of the disclosure issue with respect to the margin regulations requires further inquiry into the underlying substantive issue,

by letter dated April 22, 1988, you requested guidance on the question of whether certain securities denominated "Series B Preferred Stock," to be issued by BNS to finance part of the tender offer constitute "debt securities" for purposes of Regulation G, as interpreted by the Board.

As explained below, the question you have raised—how to distinguish credit used to purchase stock from other types of financial arrangements for that purpose—presents very difficult issues that have never before been formally addressed by the Board. A review of the relevant authorities indicates that true preferred stock does not represent an extension of credit for purposes of the margin regulations unless it is clear that, regardless of the label applied, the instrument was intended to create a debtor-creditor relationship between the parties. This kind of factual question, requiring an assessment of the intentions of the parties, is, we believe, best resolved by the courts, which are specially equipped to decide factual issues.

## LEGAL FRAMEWORK

The Board's Regulation G is issued pursuant to section 7 of the Securities Exchange Act of 1934, which provides that "[f]or the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board ... shall ... prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security...." 15 U.S.C. § 78g(a). Regulation G generally prohibits a lender that is not a bank or a broker-dealer from extending credit for the purpose of purchasing or carrying margin stock ("purpose credit") that is secured directly or indirectly by margin stock, in an amount that exceeds the maximum loan value of the stock securing the loan.[1] 12 C.F.R. § 207.3(b). The maximum loan value of margin stock is 50 percent of its current market value. 12 C.F.R. § 207.7(a).

In an interpretation of Regulation G issued in 1986, 12 C.F.R. § 207.112 (the "In-

---

**1.** Margin stock includes any equity security traded on a national securities exchange. 12 C.F.R. § 207.2(i).

terpretation"), the Board ruled that the limits on purpose credit in Regulation G apply in specific circumstances to debt securities issued by a shell corporation, the proceeds of which would be used to finance a tender offer by the shell corporation for all, or a large block, of the margin stock of a target corporation. In the Interpretation, the Board considered a transaction in which a shell acquisition vehicle would issue debt securities that by their terms were unsecured. Section 112(b). It was not disputed that the purchase of the debt securities were purpose credit for purposes of Regulation G or that the small number of sophisticated investors that would purchase the securities in very large minimum denominations could be lenders under the Regulation. Section 112(c).

The Board stated that the debt securities should be presumed to be indirectly secured by the margin stock to be acquired pursuant to the tender offer because the lenders could not in good faith extend credit to the shell corporation without reliance on the stock. The shell corporation would have no significant business function of its own, other than to acquire the margin stock, and would have substantially no assets or cash flow to repay the credit other than the margin stock. Section 112(e), (f).

The Interpretation recognizes that the presumption that the debt securities of a shell acquisition vehicle are indirectly secured by margin stock does not apply in certain cases where it is clear that the holders of the debt securities are relying on assets other than margin stock as collateral, such as when the debt securities would not be issued unless the shell corporation has acquired enough of the target corporation's margin stock to merge with the target company without shareholder approval. The presumption also does not apply when the debt securities are issued by an operating company to finance its acquisition of margin stock, where the operating company has substantial assets and cash flow other than margin stock. Section 112(f), (h).

2. NatWest is therefore subject to the Bank Holding Company Act, 12 U.S.C. §§ 1841–48, which is also administered by the Board. This letter

## THE TENDER OFFER FOR KOPPERS

The information submitted to the Board shows that BNS has made an unsolicited tender offer for all (but no less than a majority of) of the common stock and all of the preferred stock of Koppers, all of which is margin stock under Regulation G. BNS is a shell corporation that is jointly owned by Bright Aggregates, Inc., Speedward Limited, and S–L Merger, Inc. S–L Merger is a wholly-owned subsidiary of Shearson Lehman Hutton, Inc., a registered broker-dealer, and an indirect subsidiary of Shearson Lehman Brothers Holdings, Inc. ("Shearson Holdings"), which is not a registered broker-dealer. Bright is a wholly-owned indirect subsidiary of Beazer PLC, an English company engaged in the construction business. Speedward is a wholly-owned indirect subsidiary of National Westminster Bank PLC ("NatWest"), an English bank with a subsidiary bank in this country.[2]

If the tender offer is successful, BNS or an affiliate would enter into a merger transaction with Koppers. BNS appears to have no business operations and no assets of its own other than the margin stock to be acquired.

BNS would require approximately $1.7 billion to finance the tender offer. BNS would obtain approximately $298 million of this amount from Bright in return for shares of BNS's Cumulative Preferred Stock, Series A. Approximately $540 million would be obtained from Shearson Holdings in return for either BNS's Cumulative Preferred Stock, Series B, or its Subordinated Notes. Approximately $864 million would be obtained from a syndicated bank loan, which would be secured by the stock of Koppers to be acquired.

If as a result of the tender offer, BNS receives a sufficient amount of common stock (90 percent) to effect a short-form merger with Koppers (i.e., without the requirement of shareholder approval), or if BNS has entered into a merger agreement with Koppers, BNS will issue the Notes,

expresses no opinion on whether NatWest's participation in the tender offer, both directly and through Speedward, is consistent with this Act.

which unquestionably are debt securities, to Shearson Holdings. The Notes would be nominally unsecured, carry a floating interest rate and mature in 180 days or, if the merger occurs, 15 months after the merger.

If a short-form merger cannot be accomplished, BNS will issue to Shearson Holdings the Series B Preferred Stock (the "Preferred Stock"), which by its terms is not secured by Koppers Stock. The salient characteristics of the Preferred Stock are as follows:

1. Holders are entitled to a 15 percent annual cumulative dividend, payable quarterly.

2. Under applicable state law, the dividends may be paid only out of surplus or net profits of the shell corporation, as defined by statute, and only if declared by the board of directors. Del.Code Ann. tit. 8, § 170(a).

3. If the dividends are not paid, the holder may not foreclose on assets of the shell or accelerate payment, but if six quarterly payments are missed, the holder may elect two additional directors, accounting for 20 percent of the voting power of the expanded board, for as long as the accrued dividends remain unpaid.

4. If the shell corporation is liquidated, the Preferred Stock would be subordinate to all secured and unsecured debt and to other creditors. The Preferred Stock would have preference over "other capital stock" of the shell corporation.

5. The Preferred Stock must be redeemed at the end of its ten-year term. Prior to that date, BNS has the right to redeem the Stock any time 5 years or more after a merger with Koppers (if a merger occurs).

6. BNS and the holder of the Preferred Stock each has the right to convert the Preferred Stock into the Subordinated Notes, but only after any merger between BNS and Koppers.

## ANALYSIS

As your letter indicates, if the Preferred Stock constitutes a debt security, then the Stock would be indirectly secured by Koppers margin stock under the Interpretation and the tender offer transaction would violate the restrictions in Regulation G on the amount of purpose credit that may be extended. In response to your request to us for guidance from the Board on this issue, counsel for the defendants and for Koppers have submitted memoranda reiterating their arguments on the proper characterization of the Preferred Stock.

The defendants argue that the Preferred Stock has the commonly accepted characteristics of an equity investment with regard to payment of dividends, rights in the event of default, liquidation preference, and maturity. The defendants also point out that the Preferred Stock cannot be converted automatically into debt until after the shell merges with an operating company with substantial non-margin stock assets and cash flow, and by its terms cannot be redeemed for a minimum of five years.

Koppers, on the other hand, argues that whether the Preferred Stock was intended to create a debtor/creditor relationship between the parties must be judged in light of the relative positions of the parties to the Preferred Stock transaction in actual economic terms, regardless of the labels applied, especially since the holder of the Stock would have an equity interest in, and some voting power over, the entity issuing the Stock. Koppers maintains that, by holding the Preferred Stock, Shearson Holdings would have the same economic interest, in terms of the practical maturity of the instrument, rates of return, and preference in the event of a liquidation, as if Shearson Holdings had acquired the Subordinated Notes, which unquestionably are debt securities, instead of the Preferred Stock. Koppers argues further that, although in form the Preferred Stock appears to represent a relatively long-term investment, as a practical matter the Stock will be converted into debt securities or repaid within a short time after issuance, either because the shell will be liquidated if no merger takes place or because conversion would allow the second-stage financing to go forward if a merger does occur.

In the staff's view, both parties have made significant arguments concerning the

characterization of the Preferred Stock for purposes of the margin regulations and resolution of this question is by no means an easy matter. As your letter states, the Board's Interpretation does not define debt securities and neither the statute nor the Board's regulations define what constitutes an extension of credit. Thus, resort to a readily available body of agency interpretations is not possible in this instance, as it was when the Board construed the meaning of "indirectly secured" in the Interpretation.

Although it is easy to distinguish the general concept of what constitutes credit or a loan transaction from the concept of an equity investment, in practice it is difficult to draw a precise line between the two when dealing with hybrid instruments that have some characteristics of both debt and equity, as the Board has recognized in other regulatory contexts. Preferred stock is commonly understood to represent an equity interest but with many of the characteristics of debt.[3] Accordingly, Board staff has informally opined many times that preferred stock, if it is true preferred stock and not misnamed debt securities, is not considered an extension of credit under the margin regulations.

On the other hand, as you have recognized, there is some precedent that certain types of preferred stock issued by a shell corporation to acquire margin stock does constitute, or is likely to be viewed as constituting, debt securities. In the *Caesars World* case,[4] the court held, without additional explanation, that certain exchangeable preferred stock issued by a shell acquisition vehicle is a debt instrument under the Board's Interpretation "due to the underlying and ultimate intention of the issuer and the purchasers to create a creditor-debtor relationship." Staff has reviewed documentation describing the underlying transaction involved in *Caesars World* and, from the staff's perspective,

the court's opinion could have been influenced by the fact that the preferred stock was convertible into debt securities by the shell corporation and that the terms of the preferred stock imposed a severe economic penalty on the shell corporation if it did not exchange the preferred stock for debt within 10 days after the merger.[5] Thus, it could be argued that at the outset of the transaction, the purchasers of the preferred stock had effectively committed to purchase debt securities. *See* 12 C.F.R. § 207.101 (margin requirements apply to commitment to extend credit as of the date the commitment is entered into).

Similarly, in *Duro Test Corp. v. TCA–IV Limited Partnership*, Civ. No. 87–4418 (D.N.J. Dec. 9, 1987), the court found substantial merit to the contention that preferred stock issued by a shell corporation is tantamount to debt rather than equity for purposes of the Board's Interpretation, stating that the structure of the financing arrangement placed an enormous economic incentive and great pressure on the shell to redeem the stock within a nine-month period and the return to the holder of the preferred stock was characteristic of the return on debt, not equity. (Transcript, at 7–8).

In sum, the only clear proposition that can be derived from these diverse authorities is that securities issued by a shell corporation that bear the common characteristics of preferred stock are not debt securities for purposes of the Board's Interpretation unless there is convincing evidence that the way the parties have characterized the transaction does not reflect their true economic relationship and that a credit transaction is actually intended.[6] Any evaluation of the Preferred Stock in this case as representing debt or equity securities must be based upon the touchstone of Congressional concern—control of the excessive use of *credit* in the acquisition and holding of securities. In this case,

---

**3.** *See e.g.,* G. Munn & F. Garcia, *Encyclopedia of Banking and Finance* 772–73 (8th ed. 1983).

**4.** *Caesars World, Inc. v. Sosnoff,* No. CV 87–1622 (C.D.Cal. June 8, 1987), slip op. at 3.

**5.** The dividend rate payable on the preferred shares increased significantly for each quarter

that the shell corporation did not exchange the stock for debt securities.

**6.** In other contexts under the margin regulations, the Board has looked behind the label given a particular security or transaction to see if the label meets the economic reality. *See* Fed.Res.Reg.Serv. 5–470, 5–487, 5–560.

where both parties to the Preferred Stock purchase agreement are related in interest, and are dealing at less than arms length, it is particularly difficult to make decisions that implement the Congressional intent based upon an analysis of the legal characteristics of the instruments involved. In such cases, the labels applied to the transaction by the parties may give little indication of whether the purchaser of the Preferred Stock is financing the purchase with borrowed funds. Accordingly, it may be appropriate to look beyond the direct purchaser of the Preferred Stock to the ultimate source of funding at the corporate parent level to make a determination of whether the purchase of the Preferred stock is financed with borrowed funds or with equity.

In any event, the assessment of whether the Preferred Stock is debt or equity must be made in light of all relevant facts that bear on the intention of the parties. We believe that the Court, rather than the staff, is in the best position to resolve these factual issues. Unlike the Board's procedures for responding to requests for informal opinions, the Court has the ability to compel testimony and disclosure of documents and to examine and cross-examine witnesses. This is particularly appropriate with respect to this transaction since the nature of the entire takeover is at issue in the pending lawsuit. The Court has before it other factual issues concerning the underlying transaction. Resolution of these other issues is not within the Board's special expertise or jurisdiction and the Court's final findings on these issues may have some bearing on the determination of the overall intentions of the parties in entering into this exceedingly complex transaction.

In this connection the Court will be able to obtain relevant information that is not readily accessible to the Board, for example, whether in purchasing the Preferred Stock Shearson Holdings would be committing its own capital or would use funds borrowed from a third party. If the asset structure of Shearson Holdings is highly leveraged, like that of a bank, that factor

7. *See* 51 Fed.Reg. 1771, 1774, 1778 (1986).

could be relevant to a judgment on whether the Preferred Stock is, in reality, a loan.

The Board has long recognized that the courts play an important role in applying the margin rules to factual issues arising in specific cases. Thus, the Board has repeatedly advanced the view over the years that a private right of action under the margin regulations is an important mechanism for effective enforcement of these restrictions in specific transactions, especially where complex factual issues are involved, given the extremely large number of transactions that are subject to, or are claimed to be subject to, the margin regulations and the comparatively limited resources of the enforcement agencies.[7]

Although, as explained above, we do not believe that it is appropriate for us, given the unique situation involved, to provide a definitive answer to the issue you have referred to us, I hope the foregoing analysis will be of assistance to you.

Sincerely,
/s/ Michael Bradfield